Page number 20-1324, Keryn Newman and Allison Heberty, Petitioners v. Federal Energy Regulatory Commission. Ms. Newman for the Petitioner Keryn Newman, Ms. Heberty for the Petitioner Allison Heberty, Mr. Tisch for the Respondent, Mr. Gossett for the Intervener. Good morning, Ms. Newman. Please proceed when you're ready. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, I am Keryn Newman, and with me this morning is Allison Heberty. We are PJM ratepayers appearing before the Court first day. This morning, I will address past expenditures to influence public officials, as well as Account 426.4 and rate making. Ms. Heberty will address past advertising expenditures, including the formula rate mechanisms that will allow for their recovery.  This case is not about whether the Commission can change its mind on rehearing. Of course it can. This case is about the arbitrary and capricious way the Commission failed to logically and reasonably support its decision to reverse course on the recovery of past expenditures to influence public officials. A formula rate prevents the utility from utilizing excessive discretion in determining the ultimate amounts charged to customers. Past, and then later Commission on Rehearing, utilized excessive discretion by misinterpreting Account 426.4 and misinterpreting past formula rate in order to increase the charges to customers. The Commission's uniform system of accounts is a regulation that sorts utilities expenditures by their purpose. All expenditures for the purpose of influencing belong in Account 426.4. The first clause covers the influencing of public opinion. The second clause covers the influencing of public officials. Common to them both is the act of influencing. Interpreting this account so narrowly that influencing expenditures are excluded defeats the purpose of the regulation. When the Commission sets rates, it may include amounts segregated in Account 426.4 in the rate. However, that's not what the Commission did when it set past rates. In that instance, the Commission specifically excluded Account 426.4 from the rate. Past annual formula rate update filings cannot change the rate. They are not a rate making proceeding. Instead, the Commission must make an accounting determination to find the proper account for an expenditure whose classification has been challenged. Choosing at this point to place an expenditure in an inappropriate account simply to make it recoverable circumvents the limitations of the approved formula rate. The Commission has no discretion to alter or adjust the rate retroactively. However, the Commission altered past rate when it made a retroactive recoverability determination to change the accounting classification of expenditures that were prohibited by the rate on file. A recoverability determination is only properly made when the Commission is setting a rate. The Commission set past rate back in 2008, and thereafter it's a formula rate dependent upon accounting assignments. Past formula rate protocols that were included in our opening brief addendum at page A9 state that an annual update shall be in accordance with the Commission's uniform system of accounts. There's nothing in there about making retroactive recoverability determinations because making a recoverability determination at that point retroactively alters the rate on file. So, Ms. Newman, it seems like your argument really boils down to the plain language of the account of 426.4 and perhaps most simply and clearly Clause 2, which includes in that account expenditures for the purpose of influencing the decisions of public officials. And as I gather, there is no dispute that these expenditures were for the purpose of influencing the decisions of public officials, but that FERC and the intervener argue that that purpose was effectuated in an indirect manner and that we should read this clause to put into account 426.4 only expenditures for the purpose of directly influencing the decisions of public officials. Is that an accurate encapsulation of sort of your core argument? Yes, the unwritten direct versus indirect influence test that FERC added in there just doesn't make sense. The Commission did not cogently define the line between direct and indirect. I mean, there is no difference between a professional lobbyist versus a citizen lobbyist. Both individuals are directly appealing to the public officials. Do you think there's a difference between influencing public opinion and influencing public officials? The way it's written in the account, the first clause about influencing public opinion is kind of related to situations where the public actually can take the action that the utility is trying to influence, like an election or pushing an elected official to do something or a referendum, things like that. That's where the utility would influence the public opinion to get what it wants. But in the second clause, they're influencing public officials. This is the situation where only the public official himself can make the decision, and they were trying to influence the state utility commissioners to approve their project. But they say, no, we were just influencing public opinion, but it makes no sense. And $6 million trying to influence public opinion if PAF did not also intend for the public opinion that it influenced to, in turn, influence the public officials to approve their project. Well, is that right? I mean, I trust there are monies that power companies or transition companies spend for general goodwill. They might want to encourage people to buy plug-in vehicles rather than fossil fuel vehicles and just make people feel warm and fuzzy about the grid and spend money on that. I mean, that would be, for public opinion, that wasn't instrumentally related to a decision. Correct. Does that not exist? Is that just a fanciful allegory? I think that does exist. And I mean, that's something a utility would do in its normal course. But here, the whole goal of PAF was to get this project approved. If PAF could get this project approved by the state regulators, the parent companies, American Electric Power and First Energy, said to make an enormous profit from building and owning this project over its expected 40-year life. At the time they chose to influence public officials, PAF was looking at a 14.3% annual return on its 50% equity stake in this $2.1 billion project. There was a lot of money riding on the state approvals, not just liability for ratepayers. Can I ask you a question about the fact that the project's been canceled? And so, PAF is really an empty shell, I guess. And there's – how does PAF – well, PAF doesn't have a rate now, does it? Yes, it still has the same formula rate that it was – It does, but it's never going to be – it doesn't have any customers, does it? Well, PJM ratepayers are responsible for all the costs in the formula rate. So, in this case, if PAF can recover the $13.2 million back from ratepayers, it'll come from everyone's pocket in the PJM rate. Well, isn't that up to the – you know, the wholesale rate, I understand, but the retail rate, which is what I take – you pay, is totally – not totally, but it's up to the state utility commission, isn't it? Well, the state utility commission has to pass through these rates that are set by FERC without touching them. It cannot alter these rates and leave PAF stranded, even though, you know, FERC says this is – the transmission rate is a federal process, whereas the distribution rates are a state process, and the state must pass through – How much more in your monthly bill is going to result from FERC's action here? It's really hard to determine. But don't you have to determine that in order to establish standing? And let me just – a follow-up question. I mean, if it's $0.01 a month, then I don't know if there's a de minimis requirement in standing, but it doesn't seem to me to be any kind of concrete injury. So, where's your – what is your concrete injury? Well, any ratepayer has standing to challenge the rate that is set at FERC, and there is no other venue for us to challenge this rate. So, whether it's a penny or $25, we can't – I mean, FERC cannot shut us out. And, Ashley, this issue came up in the case a number of times, and the commission found in our favor that we did have standing, and neither party has questioned our standing in this case. Well, I know that, but you don't have to have standing to appear before FERC. So, the only standing that's being asserted is the standing as ratepayers who are affected by what is authorized to be passed through. I think it was asserted in the briefing that this formula rate is a typical kind of formula rate, and this is really more a question for FERC. But do you have reason to believe that the way – that the items that are in and out of this rate are also in – appear in other – other transmission formulas? Yes. They are all pretty similar. There is one exception with the advertising provisions, where some of them are slightly different, and Ms. Haverty, that's more in her wheelhouse, so I will let her explain that. If we were to agree with you that the reconsideration opinions were contrary to the plain text of the account, we don't need to reach the separate questions about whether these expenses could be appropriately put into the other accounts, the advertising and the 900-series accounts, right? Yes. Because those are residual – those are framed as only if they aren't appropriately in another account. So, if they were appropriately in 426.4, those accounts wouldn't come into play. Exactly. Before you put something in account 923, which is kind of a general account, you have to first make sure that it doesn't fit in a more appropriate account. And, I mean, some of these accounts can apply to different expenses, and maybe a certain expense could be in two lists in two different accounts. So, you really have to look at what the account language says. And so, when you have these kind of influencing expenditures, the first place to look is account 426.4, and only if it does not fit there, then you can put it in 923 or some other account. Okay. Thank you, Ms. Newman. Unless my colleagues have further questions for you at this time, we'll hear from Ms. Harvey. Harvardy, I believe. Harvardy, sorry. My Zoom moniker is blurred out. Harvardy. No problem. I've been called worse. Good morning, Your Honors. Past advertising belongs in 426.4 because advertising account 930.1, there's a note B in the Uniform System of Accounts plain language, and it reads, Exclude from advertising account 930.1 and include in 426.4 expenses for advertising activities which are designed to solicit public support or the support of public officials in matters of a political nature. The standard definition of political being related to government or public affairs of a country. FERC acknowledges, as you stated before, that advertising is intended to solicit support for approvals needed from state governmental bodies, and so those expenses do rightly belong in account 426.4. Our subsequent argument is that past advertising belongs in the other ad column of attachment 4 of the formula rate. Via the formula rate, any expense placed in 930.1 is first and foremost other ad, and those expenses would be described as you were saying, the goodwill, institutional nature, and I believe those words are actually used in the 930.1 descriptor. But those expenses, any expense in 930.1 is first and foremost in a broad category of other advertising. The exceptions, which are listed in various ways in the past companies formula rates, are similar to numerous other FERC regulated utility companies shown in the non-exhaustive spreadsheet in our brief at JA573-574. FERC's orders on rehearing are the first instance in the record of the advertising being solely and completely outreach. FERC did not point to any evidence in the record when it determined the advertising to be outreach, so characterizing all of the expenses as outreach, I believe, is a reach or arbitrary and capricious. The past companies themselves did not maintain their books to reflect any sub-accounts for 930.1. They simply placed the balance of 930.1 into the column of the formula rate, which made the entire balance the responsibility of rate payers. So, they did this instead of categorizing using definitions, descriptors, something to characterize these expenses in the different ways that the formula rate does. This arbitrary and capricious act was followed by FERC's own arbitrary and capricious act in their opinions on rehearing, where they basically did the selfsame thing. The 2020 commission went so far as to change the wording of the column header that they chose to focus on. The heading reads, safety, education, citing, and outreach related. The opinions read, safety, education, citing, or outreach in their determination. A change from and to or, while it might seem small, as well as the addition of an Oxford comma drastically changes and amounts to the changing of the formula rate retroactively. Something that cannot be done without a rate making proceeding and ignores the plain language used in several other places of the formula rate, in which safety related advertising is read to be the key determining factor. Finding all advertising is outreach further nullifies the exceptions and therefore allows for the over collection from rate payers. The formula rate obviously is aimed at avoiding in 930.1. We ask the court to vacate opinions 554A and 554B and remand to the commission for further proceedings with instructions to please follow the initial decision and opinion 554. I have one question, which is, if we, you have your point that the way that the tariff in the table retitles using the Oxford comma or not using the Oxford comma, I can't remember which way it goes, but switching it was problematic and should have been done in another way. But suppose just as a matter of hypothesis that we don't agree with you on that. And we take that second way of describing the list of the given. Do you take issue with whether the expenses were appropriately allocated to that account if we take that revised way of characterizing it as a given? So, the, the account is, is a general advertising account. What happens in the formula rate is a is where they're listing exceptions, which are then recoverable because it's understood that all advertising is not the responsibility of the rate payers. It is the responsibility of the utilities. And so, if they are, if the expenses are in 930.1, they. There are the exceptions are very specifically focused on safety related or citing related because we understand and we, we did not challenge expenses, say, advertising for open houses that we're going to be held or public meetings that we're going to be held. Those kind of those kind of advertising expenses we did not challenge and because we do recognize that the precedent is there for for those particular expenses to be recoverable. So, we did not challenge those just to be clear, and I think this is clear in your briefing that this whole categorization is only relevant if these expenditures aren't appropriately in account for 2, 6.4. Exactly argument. Yes. Yes. But our 1st, our primary argument is that they do rightly belong in 426.4 along with the actual outreach. I know there was some discussion or there was some, you know, the word outreach is used in the contracts of the, of the subcontractors and so trying to conflate the outreach. That was that the, that Miss Newman is more focused on as opposed to the outreach was not. Advertising, it was not specified to be outreach. There was no, not until not until what was it? The was it? 5, 5, 4, 8, it was the 1st time they mentioned that this was outreach. It was, it came out of nowhere. And so it kind of adds to the arbitrary and capricious way that it seems to be. Okay. Thank you. Thank you. Okay. Placing the expenses in the correct accounting accounts 1st, and then letting basically the chips fall where they may as far as the formula rate goes. Otherwise, we're doing it backwards. Is it your view that that we can that we should look or should have looked at 426 without regard to 930.1. And then if, if it finds that the expenses were fit within 426, it doesn't have to decide whether they're political or not. If they're political or not. I'm sorry. Your Honor, I actually, I don't understand that last part of the question. Could you repeat that. I'm sorry. We look at, or you have FERC look at 426 and concludes that the advertising was for the purpose of influencing public officials. Right. And so it's FERC, does FERC then have to also look to 930.1 to make sure that that fits within the definition of what a political. Well, I think, I think actually those, maybe the other, you know, that if that is at the advertising, if they, they, they wanted to put it in 930.1, but there is the note B, which says, this probably is not the account for these particular expenses. You need to go, these need to more properly be placed in 426.4 and they do fit within the descriptor of 9, of 426.4. So, I'm not sure that that determines. Well, you came up with a definition of political that says that it's influencing a public official, which makes the meshes 930 and 426 together. Where did you get that definition of political? That the influencing, well, it says the note B was, which it says note B of 930.1 is, I think what you're maybe referring to as what. So, 426.4 include in 426.4 expenses for advertising activities, which are designed to solicit public support or the support of public officials in matters of a political nature. That's, that's note B of account 930.1 in the US of A. My question is, where did you get your, your definition of what is, of a political nature? I just pulled my definition of political from the standard definition of, you know, just any dictionary. I guess you mean when I referred to it being. Approvals solicit support, let's see. Relating to government or the affairs of the country. Is that what you're referring to as my definition? Well, 1 of the, I mean, the 1 of their 1 of the past, or the witnesses also referred to political opposition when they were talking about. The, the approval process, but so. I guess 1 question I, I'm, I'm not sure that I'm following. And he can speak to it directly. What my, my colleague is is asking, but, but part of the question might be does. Does political refer to, is that a shorthand for everything that's covered by 426.4? Or is it does it contain its own potentially limiting. Meaning that might be read back into and limit. Provide sort of a gloss on what is included in account for 26.4. Apologies to anybody who I might be further confusing rather than. I think so, though, the 1, 426.4 was. Was basically so there was order to 76 that may help us. Get to an answer on this 1. Let me see is where. Some of the language that was used in. Making sure that we understood what was supposed to be in 426.4. And it actually talks about advertising in mass communications media to influence general public or public officials. It says such advertising, even where it has no specific or express objective is calculated to affect public or official attitudes towards future legislative or administrative action. I think the word political is, is, I believe, just. Understanding that it's not that it is having to do with regulation, governmental bodies, influencing those decisions made at that level. Okay, let me make sure my colleagues don't have additional questions for you. Thank you. We'll hear from the government. Mr. I'd like to pick up on the question posed by judges Randolph and Pillar regarding what is the definition of political? Because this really contextualizes this entire case. The commission reasonably found expressly paragraphs, 84, 86 and 99 of opinion. That's 5, 0, 8, 5, 13, that the disputed expenses here are not political. And it explained why it explained that the expenses here were incurred for a public benefit because determine there was a reliability need. And this project would meet that public that public or serve that public benefit. And that follows from how the commission has previously defined political versus non political. In the Alaskan Northwest case, which Chisner site, and we also say, no, 43 of opinion, 5, 5, 4, B. The commission explained there that political expenditures, quote, have a doubtful relationship to rent, rendering utility service. And there, the commission found that the disputed expenses did have to be recorded to account for 26.4 and we're not recoverable because the African head, quote, not adequately demonstrated what benefit to any have or will accrue to rate payers. That's at 61, page 61, 428 to 29 of the Alaskan Northwest order on show cause order. And that's an important distinction because it also gets to the fundamental error committed by the ALJ and the commission initially in opinion, 5, 5, 4. Both the ALJ and the commission initially compared this case to the Alaskan Northwest cases and finding that both involved expenses incurred prior to the selection of the project at issue. Here, however, there, the project had not been selected there. It was by Congress that ultimately chose the natural gas project. Here, the project was selected. In fact, PJM actually ordered the construction of the line and Well, it wasn't really in the sense that it wasn't. And in the end, couldn't go online because it didn't have certificates of public convenience and necessity. So this is not a situation where there's benefit to the rate payers from the action. In fact, rate payers never benefited from that. Well, I respectfully disagree, Your Honor. Rate payers did not benefit because the line was ultimately not built because PJM determined in 2012 there was no longer reliability need. But the question of public interest is a federal question. We're talking about a FERC regulated utility under FERC accounting regulations concerning expenses incurred by a FERC regulated utility PJM. And there's nothing in the accounting regulations commission precedent or judicial precedent that subordinates a federal determination of need to a state PUC's determination under its own policies, under its own laws. And furthermore, I don't think there's any argument that the state PUC proceedings on the certificates of public convenience and necessity had anything to do with selecting a project. It was just whether they could, under state law, block the project. So that just distinguishes these cases and takes it out of the realm of a political expense. Order 276, the preamble to account 426.4 explains, I'm going to reference our addendum at page 29, that 426.4 is all about expenditures for political purposes. So the commission's reasonable determination that these are outreach rather than political because they were incurred pursuant to an RTO ordered project to meet a public need takes it out of the realm of 426.4. Does it matter, Mr. Fish, that that was not an argument ever raised by PATH before the commission? That's an argument that FERC has developed in the re-hearings. No, Your Honor, because perhaps if PATH was challenging the commission's determinations under judicial review, but what the court is reviewing here is the commission's final order under 16 U.S.C. 825L. And it's looking at what the commission ultimately decided. We could argue if PATH was challenging us and they raised a new argument that they hadn't raised in the re-hearing request that then that argument was waived, but that's not the case here. Suppose that it's conceded that particular advertising is for the purpose of influencing the state's utility commissioners. What account does that go into? Well, it depends on whether the influence was direct or indirect, Your Honor. And here's where the commission drew a reasonable line for which we deserve deference. It distinguished the direct lobbying expenses incurred by access point. Well, it's advertising. It's on television. It's on the radio. And, you know, get to your local state commissioner and tell them we really want this transmission project. That's the advertising. Now, where does the expense of that advertising go? Does it go to 426 or 930? Your Honor, it would depend on whether that advertising is directly in front of the public officials. And here, there's no evidence it was. The ALJ at J328 explains that the promotional brochures... It's aimed at both. It's aimed at both. It's aimed at the public official and it's aimed at the public. Where does it go? Well, in your hypothetical, if it's directly, I would say that the pamphlet has to be handed to a public official, not just a member of the public. Because if it's one step removed and it's handed to the member of the public, then the hope is that member of the public is going to try to write letters to their public utility commissioner or do something else to directly influence. And that takes it away from the expense incurred here, which is only to influence members of the public. But the record shows that the only advertising here was to, quote, this is from the ALJ's decision, J328, to extol the need for reliability and why the project should be built. And he references advertising that was promotional in nature. There's nothing there that ties that advertising to direct contact with public officials. Well, not direct, but page 66, I think it is, of your brief, plus page 67, is essentially an admission that the very purpose of the advertising was to put pressure on public officials. Ultimately, to put pressure on public officials, but that's the nature of advertising. At some level, advertising is intended to persuade. What's the rationale if a group of public relations people goes to the staff of a utility commissioner and wines and dines and gets them to agree to the project, as opposed to going directly to the public utility commissioner himself or herself? What's the rationale for saying one is not recoverable and the other is? Well, Your Honor, I'd say there is no distinction there because you're talking about, you said staff, you're talking about staff who presumably are incurring an expense to lobby, to wine and dine the public official. So in either of those cases, it's more like the access point of Larry Puccio, where there's an expense that's actually tied to the activity before a public official. That's what's missing with the ALJ's conclusion that all the expenses have as their ultimate goal. Can I ask this question? I mean, the line between direct and indirect when you're dealing with public officials can be a little bit elusive, as some of the questions might be elucidating, but just under the text of the regulation, it's puzzling to me. 426.4. It says this account shall include expenditures for the purpose of insulting public opinion with respect to, and then there's a bunch of stuff that follows with respect to, including approval, modification or revocation of franchises. And that's all part of clause one, right? And is the proper way to read that, that approval, modification or revocation comes after for the purpose of? Or is it for, or it comes after, I'm sorry, does it modify for the purpose of, or does it modify for the purpose of influencing public officials with respect to approval? Public opinion, Your Honor. I'm sorry, public, yeah, public opinion in clause one. Yeah, right. Public opinion. Is it for the purpose of influencing public opinion with respect to approval, modification or revocation of franchises? Yes, Your Honor. That's, and so if- The text kind of, I don't know that the distinction, at least as an intuitive matter, makes a lot of sense, but the text talks about influencing public opinion with respect to approval or revocation of franchises. And I take it public, is it public officials who determine whether to approve or revoke franchises? Correct, Your Honor. So the text itself is kind of contemplating some distinction, apparently, that seems not entirely apparent as a matter of how we normally intuit these processes working. But this is talking about influencing public opinion with respect to revocation or approval of franchises, which is necessarily something that goes through public officials. And then, I think, and then the next clause talks about for the purpose of influencing the decisions of public officials. Right. Well, as a first matter, Your Honor, I'd say what all this boils down to is that regulation is certainly ambiguous and we've received discretion for a reasonable interpretation. But, Franchise, I think the point here is everything goes to whether the influence of public opinion was on one of the listed items in clause one. If it is, the relevance of the fact that everything goes towards influencing public officials in the end, it supports our textual argument. Well, can I ask, is the approval of a franchise a decision of a public official? Yes. Yes, Your Honor. Right. But we're not talking about franchises here. I know we're not. I don't think this question is meant to be hostile to you, actually. It's just meant to raise a question, which is the first clause presupposes that you can influence public opinions with respect to decisions of public officials. Because it's talking about influencing public opinion with respect to the approval of a franchise, and that's the decision of a public official. But then the second clause talks about decisions of public officials. I see where you're getting. I apologize, Your Honor. Yes. So to give the two independent meaning, we'd have to read them. It makes sense to read them separately. I think that… Bobby, it's just at least seems to raise that, at least potentially seems to raise that question in my mind, even though just as a matter of the way we normally think about things, for a lot of the reasons, the questions that you've been faced with presuppose, we always think about influencing public officials through the medium of influencing public opinion. That just seems natural to think about things that way. Right, exactly. And so if you could do that with certificates of public convenience and necessity, it takes the list out of Clause 1. It renders it superfluous because you couldn't seek to influence public opinion on any matter, and it would still fall under Clause 2, even if it wasn't directed at one of the items in Listing Clause 1. But what about goodwill advertising generally, where you're trying to influence public opinion to be more comfortable with what you're doing in the world? Right, Your Honor, and that would be an appropriate… it would be appropriate to record those expenses to Account 930.1 pursuant to Note A. Why wouldn't they fall within Clause 1 of 426.4? Well, again, because here we're talking about certificates not for franchises. That would be a different question if we were talking about seeking to influence public opinion on a matter of franchises. No, I'm just talking about the statute. And I guess let me back up and ask you. Your brief talks a lot about deference, but as we know, deference is only owed where the text is, you know, applying all tools of such reconstruction, the text is ambiguous. Your argument as to why the text is ambiguous as to whether direct is implicit is what? Well, the text is ambiguous because if you don't read it as applying to only expenses to have an indirect connection to influencing public officials' decision, then the list of items in Clause 1 falls out of the account. It's rendered superfluous. Clause 1 is subsumed under Clause 2 because, as Chief Judge Serena Boston said, as we normally think about it, any attempt to influence public opinion has as its ultimate goal influencing the decisions of public officials. So if you can… People will be more inclined to come and work for you. People will feel more cooperative at an eminent domain proceeding when a power line is going to go over their property. I mean, there's a lot of reasons to want to influence public opinion. Yes, Your Honor. So taking that as the case, then that further supports our position because then the ultimate goal is not to influence public officials' decisions. So all you're left with is an attempt to influence public opinion on the matter of certificates of public convenience and necessity, which are not included in Clause 1. And, you know, even if you found that Clause 2 could apply to indirect influences of public officials, under your example, Your Honor, there's no attempt to influence public officials. So the expense just wouldn't be recorded to Account 426.4. So I think under either interpretation, we get to the same place. What is the rationale for saying that you put in the 426 account expenditures to influence public opinion with respect to the franchise granting? But you don't put it in if it's with respect to the granting of a certificate. Well, Your Honor, that's something we explain in Paragraph 19 of Opinion 554B, where the Commission explains that, and this gets back to the point of whether these are political expenses or outreach expenses, seeking a franchise is seeking a lucrative status for the utility itself. It's not imbued with the same public interest, or at least it's not necessarily imbued with the same public interest. A certificate of public convenience and necessity, by definition, is all about the public need for the project. And the Commission, in its regulations, has distinguished the two terms. Account 302 uses the two terms separately. And so it's a foundational tenant of regulatory interpretation that where the Commission uses the same term in two different provisions, it should be given the same meaning. So if it's a franchise that's exclusive of Certificates Account 302, it should also be exclusive of franchises in Account 426.4. And the Commission's own precedent, going way back, has distinguished the process of seeking a franchise from the process of seeking a certificate. I can't speak, Your Honor, exactly why the Commission, when it wrote the regulation back in 1963, decided to include franchises in the list and not certificates, but that's a plain text issue. Because you represent FERC, I had a question that's really parallel to Judge Randolph's question about the rationale. And I appreciate your answer pointing to paragraph 19 of 544B. But there also seems like there's some historical – part of this is, you know, when 544 – I'm sorry – when 426.4 was written, were Certificates of Public Convenience and Necessity playing the same role that they play now? In the sort of deintegrated electricity field? I don't know the answer to that question, Your Honor. I can say I know that several of our precedents that distinguish franchises from certificates go back several decades, you know, before the advent of RTOs and organized markets. So I do think the distinction holds. I agree with you that, in a way, it doesn't matter because we're going on plain language. But what is a franchise? I mean, one of the things I've noticed is, even in the record in this case, sometimes franchise is used in a kind of casual way, meaning, you know, you got the business. Meaning synonymous, really, with a Certificate of Public Convenience and Necessity or other choice of your firm to do the work. But is there a more technical way in which the Commission uses the term in contemporary approvals? Well, Your Honor, whether you have a franchise determines whether you get to provide service to a set of customers. And that's qualitatively different from a certificate which says you can build this line. You can go ahead and break ground on this project. We find that it's needed in the public interest. And you said, whether you have a franchise determines whether you get to provide service to a group of customers? Where is that definition offered? Well, it's at least implied by paragraph 19. Where, let's see. No, no, I mean in like in statute or regulation. Well, I could refer back to our brief in looking at examples in the past where the Commission has distinguished the two. Apologize, just give me a moment. So, Page 28 of our brief. So, Illinois Public Service Company, this is 1966. So we are going back a long time where the Commission has distinguished the two. A natural gas company received a franchise for the right to deliver gas to those towns. And later, it received a certificate of public convenience and necessity authorizing it to commence the service. So the first was a competitive, presumably a competitive bid. You know, winning the right, perhaps because it could provide service at a lower rate. And the second certificate was a finding, well, it was an authorization that that service could actually go forward. And that's also reflecting Algonquin Gas Transmission Company and Trunkline Gas Company. I don't know that I can give a completely satisfactory answer to your question, Your Honor, because the past precedent is somewhat limited and I don't have at the ready a precise definition that we've offered beyond what we have in the record here. Can a franchise be, you're sort of drawing a distinction it seems like between public spirited and private spirited. And it seems like really a lot of your argument is animated by this distinction that you see that the purpose of 426.4 is to render certain things off limits for purposes of passing on to the rate payers and that would be private spirited things and then the residual stuff that can go into 930 and 923 is public spirited stuff that can be fairly passed on to rate payers. That's sort of a large measure of the underlying logic here. And what I'm wondering is for franchises, which are specifically denominated in 426.4 and therefore would be off limits for passing on to rate payers, are the franchises that are publicly spirited. So it actually makes sense to pass on well associated costs to Let me understand your question, Your Honor, why you're saying franchises would be publicly spirited. Well, I guess what I'm saying is, it seems like part of the distinction you're drawing between franchises and certificates, at least with a certificate in this case, is that the certificate in this case has this imprimatur that it pertains to the public in a way that it makes sense to pass on the associated costs to rate payers. Whereas a franchise wouldn't necessarily do that because it could be just for the private gain of the entity that's requesting the franchise. And what I'm asking, I think that's part of the logic of your submission and it seems to be in paragraph 19 and some of the other places in 554 and 554A and B. And what I'm asking is, are there franchises that overlap with certificates in this way and that the franchise actually would be perceived as doing something that would be public facing in a way that it would make sense to pass on the associated costs to rate payers? Yes, Your Honor, there could be. And I think this points to an important distinction that this court highlighted in its 2008 Braintree decision. Account 426.4 in and of itself does not bar passing expenses reported there through rate payers. But it sounds like for most formula rates, 426.4 is not included. Here, that's true. Yes. Is that not generally true for formula rates? No. And that's why this case is a bit sui generis and why the court, we don't have an opinion directly relating to what the circumstances here where it's just a straight accounting determination. In Braintree, the court didn't even need to decide whether the expenses, which included lobbying there, had to be recorded to 426.4 at all because it found ultimately, because 426.4 was included in that formula rate, the costs were properly passed through to rate payers because they were all imbued with the public interest. They all had to do with an RTO objective. And here we have the same situation. All these expenses, the expenses incurred, serve an RTO objective of reliability. I thought there was a stated rate, not a formula rate in ISO New England. You said it was okay under the formula rate. I apologize, Your Honor. It shouldn't make a difference, though, whether it's a stated rate or a formula rate. Right. I mean, the point was it wasn't excluded there. So that wasn't the question. The question was, is it compelled stage? I mean, there were other issues there. So the question is sidestepped. But I guess the underlying question is, the Chief said that for formula rates, it seems that 426.4 is often excluded. And I'm interested, is that not the case? Because you seem to be pushing back on that. So, I don't know the answer to that question. That's not exactly in the record. To the extent that petitioners argue that this is an odd formula rate, they do so only in their reply brief. And that argument I respectfully submit as waived. Wait, wait. You don't know whether this formula rate is typical or unusual? I'm sorry, let me make it a more specific question. Whether excluding recovery for amounts appropriately in account 426.4 is typical or not? It's not something that you know? That's not something that I know beyond the precedent of this court. And in Braintree, the court said it doesn't matter. It doesn't matter if it's reported to 426.4 or not. In that kind of rate, if it's a standard rate. But I think the question is a question about the broader importance of the decision in this case. Is this a very exotic formula rate? A one-off? Or do most formula rates allow recovery under other accounts, but not passing through to rate payers amounts that are appropriately described by 426.4? You have no idea. I'm happy to look into it. All I know is the precedent that we have with the commission and this court, which has not had to resolve this issue. So I agree that the issue is important for, you know, for broader purposes. But I think at the end of the day, whether excluding 426.4 from formula rates is typical or not, the question ultimately boils down to what is a proper accounting determination? What does the text of 426.4 reasonably accommodate? And we're talking about, you know, petitioners point to no evidence to suggest that the certificates applied for in the three states somehow fall under the definition of franchise in account 426.4 for federal purposes. There's nothing, there's no evidence to suggest that. So we have to take the certificates as they're named in the states on their face as distinct from franchises, which are covered in Clause 104 of 426.4. And as for, I think we've, you know, gone around this a couple of times in a couple of different ways, in ways that reinforce our interpretation of Clause 2 as applying only to expenditures with a direct connection to influencing public officials. And again, the Commission drew a reasonable distinction here. It didn't say that all the disputed expenses can be recovered from rate payers. It said those by access point and Liricuccio, where there was evidence of an expense tied to direct lobbying of public officials, those had to be recorded to 426.4. And those expenses are not at issue here. PATH didn't dispute that finding. All we're left with are the expenses that are tied to PATH's contractors seeking to influence public opinion. And those expenses stop at the water's edge of the public. There is nothing in the record. Let me make sure my colleagues don't have additional questions for you, Mr. Fish. Thank you. Thank you, Your Honors. We request you deny the petition for review. Thank you, Mr. Fish. We'll hear from intervener, Mr. Gossett. Sorry, I'm trying to unmute. Thank you, Your Honor. Chief Judge Sreenivasan, and may it please the Court. I think now may be a good time to take a small step back and focus on what this case is basically about, which is whether PATH can recover what are ordinary expenses that, in the development of a project like this, that was ordered by PJM and approved by FERC. To be sure, to develop these transmission lines, PATH had to play in the court of public opinion. But the evidence is that that was normal and necessary and in no way makes the expenses unrecoverable. That's the point of this Court's Braintree decision, which said that it can be recovered and affirmed the commission not even deciding if certain expenses were in 426.4. Can I just stop you, Mr. Gossett? You and Mr. Fish have referred to this as ordered by PJM. Presumably, PATH applies for this. I mean, this is not a hijacking of a private company out of the blue, right? This is something that PATH wants to do as a business matter and gets the job from the ISO. Sorry, Your Honor. I didn't mean to talk over you. That's not my understanding. My understanding is that the way this works is that PJM, the RTO, determines that there is a reliability problem, that there was a problem with adequate electricity in the DC-Baltimore area, and then went about figuring out how to solve that reliability problem and chose this project and then designated specific entities to construct the project. It is, of course, the case that those entities were interested in the project, but the determination was made by PJM, not by PATH, and PATH didn't create the project and bring it to PJM in the first instance. It's really helpful, but PATH applies, or does PJM kind of look out and say, who's best for this? I'm going to hire PATH to do it. Who approaches who? My understanding was that PATH, that PJM determines there's a reliability problem, and then PATH says, hey, actually joins some pieces together and says, hey, we're interested in that. I'm not sure the exact order. I mean, I think it's a discussion at that point. Obviously, the two companies that created PATH, its own company, were the two primary transmission owners in the region. So it's unsurprising that they would have been selected to do it, but it wasn't the case that they were the initiator of the project, if that makes sense. Right. No, because this is under NISM, of course, but it struck me as a little odd to say the project is ordered by PJM, when it's a business venture that PATH is voluntarily entering into. I don't actually think in the end it counts as voluntary. I believe that once PJM instructs them to make the project, it is no longer voluntary on their part under the PJM governing documents. They have been instructed to take all efforts to make the project in the interest of all of the PJM customers in a 13-state region. It's not specifically that they are now choosing to work on it. They can't just stop working on it because they've been told to make the project and told to use their best efforts to doing so. And that's why I point out that the evidence in the record is clear that these sorts of expenses are normal in that sort of project. So once they've agreed, maybe that they have obligations to continue, but I'm sorry, this is not a business venture that PATH voluntarily entered into? Your response was about, you know, once PJM had instructed them to proceed, they had to proceed. Of course, they're under an obligation. And this matters because the Chief Judge is raising this question about public, and the Commission raises this question about, you know, public spirit versus private interest. And so this seems to me this is a really, you know, having an accurate description of how these projects are undertaken and in whose financial interest they are and when matters. Can I answer the question in a slightly different way because I clearly wasn't quite getting where you were trying to go? And I think this does go to the same point, which is the distinction between the franchise and the certificate that Mr. Fish was talking about in that in the context of a franchise, someone is competing for work. They're asking to be able to be the electric provider in a certain region or something like that, and there are multiple entities that are competing for that, whereas in this case, that's not what's going on. And I think this is important because this is the distinction and the distinction that the Commission itself drew with the Alaska cases, in which both the Northwest Alaska and the other Alaska case involved expenses before the selection of the entity that was going to create that project. I mean, to be sure, that entity was going to make money off of the project, but that wasn't what the point is. The point is that it was—they had been selected in that instance by Congress, in this instance by PJM for its approval to do so, at which point they were obligated to work on the project. And I think that's the critical point about when we're talking about how this is a necessary project to go forward, is that someone else has decided that the project is necessary. Is that why the Commission's orders repeatedly refers to already approved? That's the significance to the Commission, it looks like. Yes, Your Honor. In a number of the paragraphs, it talks about an already approved project. Exactly, Your Honor. Your Honor. And one more point on the last point to Judge Pillard about the cancellation, which you had raised before, which, again, to our mind is completely irrelevant because it's the same thing. While they were told that this project was a necessary thing for the reliability of the network by PJM, they worked on it. PJM decided it no longer was necessary in light of the 2008-2009 recession and a significant decrease in energy usage, and therefore they stopped working on the project. But that was not something that PAF decided. It had nothing to do with the certificates. It had to do with the overall network in the entire region, which PJM, not PAF, decided rendered this product no longer important, and therefore they stopped at that point precisely and stopped billing to the PJM rate payers as a result of that. Is it possible that franchise has a different meaning? When I think of franchises, I think of McDonald's or Taco Bell or whatever they are. You don't need a public official to get the approval to open up a McDonald's, at least I don't think you do. Are there franchises that are doled out to public utilities that are not doled out, but they enter into the contracts that are private-private? Not in this context, no. I mean, that's why in 426.4 it talks about the approval modification or revocation of franchises. That's a governmental action. The way in which the term is, I think, used similarly in that context is that most McDonald's franchises are exclusive in a region. That's what you're getting is the exclusive right to be the McDonald's owner in Northwest DC. To here, a franchise would be an exclusive right to provide electrical service in Northwest DC in that example, whereas here we're talking about a transmission line that the approval of would in no way prevent another line to be approved. It doesn't directly connect to— It would, though, prevent someone else from building that line. They're not going to do two lines. And I think that PERC uses the term loosely this way in the record. They talk about getting a franchise, meaning getting the job, referring to actually PJM's selection of path for this line. So it does seem like there's a—I mean, at best it's ambiguous, so there's that. On the question of whether it's sort of public or public-spirited or not, I mean, there's really almost a—there's kind of a federalism issue here. The 426.4 public officials can be state officials or federal officials. And with respect to the state officials who have to grant the public—certificate the public convenience and necessity, this was not an already approved project, right? There's a public interest that has yet to be satisfied that's a state-level public interest, right? Yes, Your Honor, I agree that there is an approval process that the state has to go through. It is not a selection process. It is a decision process. But, yes, there is a course. But this is where the terms of the regulation are, I think, controlling. They don't address that. It is also the case that if you use the political nature language from the later note in the advertising thing as an overall description here, I mean, the selection of who's going to provide service is a much more political choice than do you license someone to build something that isn't preventing someone else from doing so. I mean, when you talk to people who—I mean, I think like the pro se petitioners in this case, when you talk to people who are affected by those decisions, they're very political, very political. You know, the public service commission—the commissions and whether they're going to grant these certificates of public convenience and necessity, whether—you know, what kind of demand is counted, and do we really need this, and, you know, should we pay for it? Very political, no? In a lay sense of the term, certainly. But in ISO New England and in this court's Brain Tree decision, the commission and then this court discussed how in the context of an RTO or ISO approved project, another entity has made the determination that this is in the interest of the rate payers of the entire network. And all that has happened here is the implementation of that. It's not a decision being made by PATH in its private pecuniary business interest. PATH is executing a decision made by the nonprofit PJM that is responsible for all electricity in a 13-state region and determined that this project was important for all of the electric users in that region. Okay. Let me ask—make sure my colleagues don't have additional questions for you, Mr. Gossett. Thank you. Thank you. Ms. Newman, we'll give you a rebuttal time. You have two minutes. Thank you, Your Honor. I would like to point out that on the hearing, the commission ignored evidence that the coalitions in PEATS were for the purpose of recruiting business and union leaders using quid pro quo arrangements and sponsorship money to represent past interests in the state public hearings. These weren't informational efforts. I would also like to point out that the Braintree case, that was a stated rate case, and that was about making a recoverability determination. Could the commission include account 426.4 in the ISO's rate? Now, PATH's case is a formula rate, so it's an accounting determination, as the commission has said. So there you only have to find the proper account. So the Braintree case is completely different from this because accounting determinations are completely different from recoverability determinations and when they were made. Another thing, I would like to point the court's attention to something the commission said in its opinion number 554, paragraph 53, that's in the joint appendix at page 353. The commission said that there was no precedent for such a narrow interpretation of the first clause or a rigid separation between the influencing of public opinion and the influencing of public officials. In fact, none of the relevant precedent made such a narrow determination. Instead, in all of these cases, the commission's interpretation of the language was broad. And this aligns with the commission's order number 276 that said that the interpretation of the language of the account should be made in its broadest meaning. In his concurrence, joint appendix page 298, Commissioner Black said he was fearful that too restrictive an interpretation of the language of the account would allow utilities influencing expenditures to be lost in the recoverable operating expense accounts. Commissioner Black's fear has been realized in this case. A narrow interpretation of the first clause opens the door to excluding utilities' influence on a whole world of utility expenditures that are not included in that very short list, things like a rate case. Rate payers should not have to pick up the tab for utilities' influence of public opinion and public officials to increase the rates they pay. And I see that my time has expired, so thank you very much. Thank you, Ms. Newman. Thank you to all who presented arguments this morning in this case. We'll take this case under submission.
judges: Srinivasan, Pillard, Randolph